·Hamilton National Bank of Chattanooga,
Appellee-Respondent,

*v.*

N. L. Swafford and Chattanooga Discount
Corporation, Appellant-Petitioner.

376 S. W. 2d 470.

(*Knoxville,* September Term, 1963.)

Opinion filed March 5, 1964.

WHELESS & HYDE, Chattanooga, for petitioner.

MOON, HARRIS & DINEEN, Chattanooga, for respondent.

MR. JUSTICE WHITE delivered the opinion of the Court.

We have granted certiorari from the decision of the Court of Appeals on petition of Chattanooga Discount Corporation, defendant below. After a thorough study of the record, authorities, and respective briefs, we now determine the questions presented.

The Hamilton National Bank of Chattanooga brought suit in Chancery Court against the Chattanooga Discount Corporation and N. L. Swafford, individually and doing business as S & L Motor Company, to recover the sum of $6,950.00 represented by a check issued by the Chattanooga Discount Corporation on November 17, 1959, payable to S & L Motor Company, and drawn upon American National Bank and Trust Company in Chattanooga, Tennessee.

On November 17, 1959, S & L Motor Company was given credit for the check on its account in the Hamilton National Bank. On November 19, 1959, the Hamilton National Bank received the $6,950.00 check back from the American National Bank and Trust Company unpaid and marked "payment stopped".

N. L. Swafford, individually and doing business as S & L Motor Company, made no defense to the suit on the check and a pro confesso was entered against him on February 25, 1960, and has become final. The defendant, Chattanooga Discount Corporation, denied liability on the check on the grounds that the check was procured by fraud of S & L Motor Company and averred that the bank was not a holder in due course.

The chancellor sustained the contention of Chattanooga Discount Corporation; holding that the Hamilton National Bank of Chattanooga was not a holder in due course and holding that the payment by Hamilton National Bank of the $6,820.38 check payable to itself, while returning the $7,330.00 check payable to Chattanooga Discount for insufficient funds, was an unlawful preference and dismissed the complainant's bill. The complain-

ant, Hamilton National Bank, perfected its appeal to the Court of Appeals.

The Court of Appeals reversed the chancellor, finding that the Hamilton National Bank was a holder in due course on the facts as set out in the chancellor's opinion and that honoring the $6,820.38 check payable to itself was not an unlawful preference as a matter of law.

The Court of Appeals directed that a judgment be entered in favor of the Hamilton National Bank for the sum of $6,950.00, plus interest from December 29, 1961 to the date of the judgment in the Chancery Court, and remanded the cause to the chancellor for the purpose of determining if the Chattanooga Discount Corporation saw any equity for itself in any of the notes and collateral held by the appellant bank, and paid by the check for $6,820.38 of S & L Motor Company, and if it so desired that the note and collateral to be transferred to the Chattanooga Discount Corporation by way of subrogation.

The facts in the case are substantially as follows:

The petitioner, Chattanooga Discount Corporation, had, for some time prior to November 17, 1959, been doing business with N. L. Swafford, doing business as S & L Motor Company in Chattanooga, Tennessee. Swafford was engaged in the used car business and financed his operation by floor-planning cars with petitioner, Chattanooga Discount Corporation. Swaffiord also owed money to the Hamilton National Bank, which handled his checking account. The parties will be referred to as S & L, Chattanooga Discount and Hamilton National.

The debts which S & L owed Hamilton National amounted to $9,459.97. Some $5,450.01 of this debt rep-

resented six loans to persons to whom S & L had sold automobiles and which loans were supposed to be secured by liens on such automobiles. Another $1,365.00 of this amount was for a draft drawn on the S & L Motor Company through the Capa State Bank of Capa, Michigan. There was a $453.18 balance due on a note executed directly by S & L to Hamilton National and secured by a deed of trust on a 1956 Buick automobile, and a balance of $2,187.78 owed on a promissory note executed by S & L and N. L. Swafford to the Hamilton National, for which there was no security. The latter unsecured indebtedness was the result of a rather unusual transaction which occurred between S & L and Hamilton National in 1958.

On September 25, 1958 the bank (Hamilton) erroneously credited Swafford's account with $3,366.03, being a deposit made by S & S Motor Company. When the bank discovered the error and notified Swafford he said that he had already used the money. Swafford then executed an unsecured note to the bank for that amount payable at the rate of $25.00 per week and the balance of this on November 17, 1959 was $2,187.78.

A few days prior to November 17, 1959, Hamilton had learned that some, if not all, of the automobile which were supposed to be security for the six loans made to purchasers from S & L had been sold. The bank made demand upon S & L for the payment of the notes as well as the $1,365.00 draft. S & L executed a check to cover these debts in the amount of $6,820.38 on November 17, 1959. The check was payable to Hamilton National and drawn on S & L's account in said bank. This check was given to Hamilton National at some time on the 17th

or 18th of November, 1959 and posted the morning of the 18th of November, 1959.

As stated supra, S & L was floor-planning automobiles with Chattanooga Discount. As a result of such transactions there was a constant flow of checks between S & L and Chattanooga Discount. Chattanooga Discount was a local financial firm and Hamilton National had handled many checks drawn by Chattanooga Discount and payable to S & L. It was the custom of Hamilton National to treat checks drawn by local banks and financial institutions as if they were cash for the purpose of crediting the account of a depositor when the depositor deposited such checks to his account. In other words, Hamilton National did not normally limit the credit given as a result of such a deposit. The record shows that N. L. Swafford considered such checks as cash when he deposited them in Hamilton National and felt free to draw upon them and had done so over a long period of time prior to November 17, 1959.

On Thursday, November 12, 1959, S & L gave Chattanooga Discount a $4,805.00 check drawn on S & L's account in Hamilton National and payable to Chattanooga Discount. This check was deposited by Chattanooga Discount in a collecting bank on Friday, November 13, 1959, and reached Hamilton National at some time on the 17th of November, 1959.

On Monday, November 16, 1959 S & L gave Chattanooga Discount a $7,330.00 check drawn on Hamilton National and payable to Chattanooga Discount. This check too was deposited by Chattanooga Discount in a collecting bank and presented through the clearing house sometime on the 18th of November, 1959.

At the close of the business day on November 16, 1959, there remained in the account of S & L $2,533.45. This balance remained until sometime on the 17th of November, 1959 when S & L made a deposit. The deposit was a check of Chattanooga Discount payable to S & L for $6,950.00. The $4,805.00 check, supra, payable to Chattanooga Discount was obviously presented by the collecting bank prior to the posting of the $6,950.00 deposit on the 17th of November, and was, therefore, returned unpaid for insufficient funds. The closing balance on the 17th of November, 1959, in S & L's account was $9,483.45.

In posting the deposit Hamilton National treated the $6,950.00 check drawn by Chattanooga Discount as cash, as was its custom with respect to checks drawn by local financial institutions.

On the morning of the 18th of November, 1959 Hamilton National had two checks to post against the account of S & L. One was the $6,820.38 check payable to itself and the other was the $7,330.00 payable to Chattanooga Discount. Since the balance in the account was only $9,483.45, it was obvious that both checks could not be paid. Hamilton National chose to pay the check payable to itself and returned the check payable to Chattanooga Discount unpaid "for insufficient funds".

On the 19th of November, 1959 one of the bank officials noted that during the previous night all of the cars of S & L had been removed from its lot, and upon further inquiry the bank officials determined that the remaining indebtedness of S & L to it was in danger. At that time Hamilton National set off the remaining outstanding indebtedness of S & L against the account, leaving it exhausted.

As soon as Chattanooga Discount became aware that the $4,805.00 check had been returned for insufficient funds, payment was stopped on the $6,950.00 check which it had issued payable to S & L. The stop payment order reached the drawee bank before the check was presented for payment and it was returned to Hamilton National unpaid.

The record is clear that Chattanooga Discount would have an absolute defense against S & L because of S & L's fraudulent action, as a result of which the $6,950.00 check was executed payable to S & L. Hamilton National, however, claims to be a holder in due course of the check for $6,950.00. If, in fact, Hamilton National was a holder in due course, the aforesaid defense would not bar its suit against Chattanooga Discount Corporation.

The chancellor found that the bank had no knowledge of Swafford's fraudulent actions and conduct toward Chattanooga Discount and that the bank had no knowledge and notice of any infirmity or irregularity concerning the check for $6,950.00 given by Chattanooga Discount to Swafford nor did it know nor have any reason to inquire into the consideration given therefor. The Court of Appeals concurred in these findings of fact, but found that the legal conclusion reached by the chancellor was erroneous, since in such case Hamilton National would be a holder in due course.

T.C.A. sec. 47-152 states:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"(1) That it is complete and regular upon its face;

"(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"(3) That he took it in good faith and for value;

"(4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

■■ It is not enough that the purchaser of a negotiable instrument purchases it under suspicious circumstances without actual knowledge of any infirmity or defect on the part of the holder. *Security Finance Co. v. Duncan*, 5 Tenn.App. 631 (1927). The rule of suspicious circumstances does not apply to a holder in due course, since he must have actual knowledge of the defect. *Windt v. Lindy*, 169 Tenn. 210, 84 S.W.2d 99 (1935). The law in Tennessee is set out in T.C.A. sec. 47-156:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

A good statement of the test for knowledge is found in *Corinth Bank & Trust Co. v. Security National Bank*, 148 Tenn. 136, 148, 252 S.W. 1001, 1004 (1923):

"There is not much difficulty in stating the rule of law defining the duties and obligations of a party to whom negotiable paper is presented for discount or sale before due. He is not bound at his peril to be on the alert for circumstances which might possibly excite suspicion of wary vigilance. He does not owe to the

party who puts the paper afloat the duty of active inquiry in order to avoid the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence. The holder's rights cannot be defeated without proof of actual notice of the defect in title or bad faith on his part, evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he has acted in *mala fide*, his title, according to settled doctrine, will prevail.''

■ The doctrine of constructive notice with reference to this matter was abolished by the negotiable instrument act. *Hight v. McCulloch*, 150 Tenn. 117, 122, 263 S.W. 794 (1923).

■ Under the facts found by the chancellor and concurred in by the Court of Appeals, we agree with the Court of Appeals in its conclusion of law that the Hamilton National Bank was a holder in due course, without notice and, therefore, the assignments of error relating to this point must be overruled.

The Court of Appeals found that Hamilton National had given full value for the $6,950.00 check of Chattanooga Discount by giving credit to S & L and honoring checks against the account until the account, including the $6,950.00 credit, was exhausted and all of this before it had any notice of the stop payment order or any defect in S & L's title to the $6,950.00 check.

T.C.A. sec. 47-125 defines ''Value'' as:

''* * * any consideration sufficient to support a simple contract. An antecedent or preexisting debt consti-

tutes value; and is deemed such whether the instrument is payable on demand or at a future time."

The court in *Buchanan & Co. v. Madison Bank & Trust Co.*, 7 Tenn.App. 373, 375 (1927) says:

"Where the bank allows a depositor to draw against the deposit, it pays value and may be a holder in due course of the check deposited. If a bank permits the depositor of a check to draw a portion of the amount of the check it is a holder in due course to the extent of the amount thus paid."

For the foregoing reasons we agree with the Court of Appeals.

There remains the question of whether or not Hamilton National made an unlawful preference by paying the check payable to itself rather than that payable to Chattanooga Discount, or non-payment of both checks. It was the opinion of the chancellor that the case of *Louisville & N. R. R. Co. v. Federal Reserve Bank of Atlanta*, 157 Tenn. 497, 10 S.W.2d 683 (1928), was controlling in this matter. The Court of Appeals ruled that said case was not controlling and reversed the chancellor. In that case Mr. Chief Justice Green, speaking for the Court, said at 505 of 157 Tenn., at 685 of 10 S.W.2d:

"When a bundle of checks is presented through a clearing house, all must be paid, or none. The payer bank is not entitled to select checks for payment, if funds to pay all are insufficient."

We must agree with the Court of Appeals. In the instant case the $6,820.38 check payable to Hamilton National was presented directly to the bank by the drawer and the $7,330.00 payable to Chattanooga Discount was

556

presented to the bank by a collecting bank through the clearing house. The record does not show that they were presented at one and the same time for payment.

In any event, the statement made by the Court in the L & N case, supra, was not strictly necessary to the decision reached by the Court in that case. The statement was based upon a clearing house rule set out in Volume I of Morse on Banks and Banking (1928), at page 821, Section 354. The author of the text was critical of this rule and by way of analogy said:

"If a hundred or a thousand men try to enter a hall and get crowded in the way so that none can enter, a benevolent policeman would not make this an excuse for sending them all away entirely, but would straighten out the column, and let them enter in file, so far as the hall would hold them."

■ These clearing house rules are not meant to have the effect of statutory law. While in a certain state of facts they might affect the outcome of a particular case, they are by no means the law. 7 Am.Jur., Section 846 makes it clear that these rules differ in different places and are not binding on non-members, nor of benefit to them in such instances as the instant case where Chattanooga Discount, a payee of an uncertified check, seeks to use one as the source of a supposed duty to it, owed by the drawee bank.

"The rules of a clearinghouse measure the rights and duties of the clearinghouse and its members; these rules have the force of law between the associated banks. A like effect may be given to clearinghouse usages, which stand by tacit adoption as the contract of the parties. However, the rules and usages of a clear-

..inghouse are binding only on the clearinghouse and its members;-they have no bearing on the rights and liabilities of third persons dealing with a constituent bank, or of third parties generally. Accordingly, nonmembers of the association are not parties to its regulations, and whatever effect is to be given to those regulations as between the banks, nonmembers are not in a situation to claim the benefit of them; nor, on the other hand, are they bound by such regulations. Further, the rules of a clearinghouse, as such, do not govern the rights of a drawer or payee of a check who is not a member of the clearinghouse and does not contract with express reference to such rules. On like principle, the clearinghouse rules are not binding on banks in dealings with each other wherein the clearinghouse is not involved. Nor is a depositor bound by the rules of a clearinghouse of which his bank is a member, to which rules his bank conforms.''

Our case of *Louisville & N. R. R. Co. v. Federal Reserve Bank of Atlanta* supra, is the only one in the country which has purported to give such a clearing house rule the force of law.

6 Zollmann, Banks and Banking (1936), Section 3753 says:

''Order of Payment of Checks Where Deposit is Insufficient to Pay All

''While the prima facie presumption is that checks are paid in the order in which they are drawn, the duty of banks merely is to pay them as they are presented, so long as the account is sufficient for the purpose.

''The implied contract of the bank with the depositor is to pay his checks in the order of their presentation,

so long as the fund remains unincumbered. No depositor has a right to demand that his check be given priority over checks coming in earlier.

"Banks could not do business on any other basis. They are acting in good faith where they pay in the order of presentation, and this is all that can be required of them."

In modern times most banks which handle large numbers of checks sort and post them by means of machines at central and branch offices. What might well have been a reasonable rule and custom in 1928, when the L & N case was decided, is by no means such now, in light of modern developments. Bailey, Brady on Bank Checks (1962), at pages 312-313, says:

"Where checks are received at different times, it is generally held that the bank should pay them in the order received without reference to the dates of the checks themselves. This rule is impractical in modern times; it is burdensome to require the payor bank to keep a record of the time when any particular check is received.

"Where checks are received simultaneously, the bank is bound to pay such checks only to the extent of the amount on deposit but payment may be made in any order the bank chooses."

It now seems to us that a bank would be wholly unjustified in returning two, ten, fifty or a hundred checks drawn by a depositor upon his account when he had a sum of money on deposit, say $50,000.00, but the total of the checks aggregated $1.00 in excess of $50,000.00.

The above case is annotated in 61 A.L.R. 954, 960, and it is said there that a diligent search has revealed no other case involving this precise situation.

In 7 Am.Jur., Banks, Section 524, the same rule is announced, but the only authority for the rule is the Tennessee case.

Section 541, on the same subject, says:

"The mere fact that the aggregate of several checks of a depositor presented to the bank for payment at the same time exceeds the amount of the deposit account does not entitle the bank to refuse payment on all of the checks. The *prevailing view is that in such case the bank must satisfy the checks until the deposit is reduced below the face of any remaining checks, making payment in any order it may decide.* This imposes no hardship on the bank, nor can the depositor complain, for he is himself responsible that his account is overdrawn, and if any damage thereby results, the loss falls upon him." (Emphasis supplied.)

6 Zollmann, Banks and Banking (1936), Section 3754 says:

"In case two or more checks are presented simultaneously, the bank having sufficient funds to pay only one, there is no necessity for injuring the customer's credit by dishonoring all of his checks. The drawer is in no position to complain against the choice made by the bank. The bank may pay such checks in whatever order it chooses. But it must pay at least one of them.

"Where, therefore, a bank receives in one clearing house transaction, or over the counter, or by the same

mail a number of such checks, if it applies the amount on hand so far as it will go to the payment of the checks in any order it sees fit, it will not thereby render itself liable to the holder of a check remaining unpaid, assuming that there is no exceptional reason for a preference.

"The mere priority in the drawing of a check does not give any priority of right to the funds of the drawer over holders of checks subsequently drawn; and, where checks are presented by different individuals, at the same time, of an amount greater than the fund of the drawer in the bank, the officers of the bank are not bound to settle the conflicting claims of the holders of the different checks to priority of payment."

The case of *Castaline v. National City Bank of Chelsea,* 244 Mass. 416, 138 N.E. 398 (1923), has been annotated in 26 A.L.R. 1484. In that case the plaintiff, a depositor in the bank, drew two checks on July 12, 1920; one for $100.00 and the second one for $300.00. They were presented to the bank for payment simultaneously on July 13, 1920, arriving with others through the mail. The available funds to the credit of the plaintiff when the checks were presented were $379.57. The bank refused to pay either of the checks on the ground that the total amount of both exceeded the deposit of the plaintiff.

Thereafter the plaintiff brought an action in contract or tort to recover damages for injuries to his credit.

The court said:

"The two checks drawn by the plaintiff were presented for payment at the same time. There were sufficient funds on deposit to pay one of them, and in our opinion, it was the duty of the bank, in the absence of custom

or a rule of bankers to the contrary (such as clearing house rules), to honor one of the checks, the bank having the right to make payment in any order it may decide, until the deposit is exhausted.''

As authority for this ruling the Massachusetts Court cited the case of *Reinisch v. Consolidated National Bank,* 45 Pa.Super. 236. In that case the plaintiff's balance was $328.00. Seventeen checks, aggregating $664.00 were presented at one time through the clearing house. Payment was refused and they were all returned. It was held that it was the duty of the bank to pay some of the checks until the balance was so reduced that it was not longer possible to pay any of the remaining checks. In the opinion of that court, there was no necessity for injuring the plaintiff's credit by dishonoring all of them when some of them could be paid.

Of course, it is elemental that the contract and the relationship is between the bank and the depositor whereby they become debtor and creditor and, of course, the bank owes its primary duty to the depositor and not to some third party.

Bailey, Brady on Bank Checks (1962), Section 10.2 makes this clear:

''One of the implied terms of the contract between a bank and its depositor is that the bank will pay checks drawn by the depositor, if he has on deposit sufficient funds to his credit. A wrongful refusal on the part of the bank to pay a depositor's check will render the bank liable to the depositor for such damages as are natural and probable consequences of the refusal.

''The bank is, however, entitled to a proper legal demand by check or equivalent before its liability to

pay. is fixed and it has been held that a letter from a depositor to the bank asking that the bank send half of the deposit by return mail and the balance within a specified period is not such a legal demand.

"The obligation of the payor bank to pay a particular uncertified check in proper form is for the benefit of the drawer of the check. The holder of an uncertified check has no claim against the drawee or payor bank which declines to pay such check."

In addition to reasons cited herein, the record before us does not show that the two checks involved in this case were presented at one and the same time for payment.

In the case at bar the check for $6,820.38 payable to Hamilton National was presented directly to the bank by the drawer and the $7,330.00 check payable to Chattanooga Discount was presented to the bank by a collecting bank through the clearing house.

We agree with the Court of Appeals to the effect that the prior decision of this Court in *Louisville & N. R. R. Co. v. Federal Reserve Bank of Atlanta* is not controlling under the facts as presented here, and the Hamilton National Bank did not unlawfully prefer itself by paying the check payable to itself while refusing to pay the check payable to Chattanooga Discount.

Therefore, for the reasons appearing herein, the action of the Court of Appeals is affirmed and the costs here will be taxed against the petitioner, Chattanooga Discount Corporation.

BURNETT, CHIEF JUSTICE, DYER and HOLMES, JUSTICES, and CLEMENT, SPECIAL JUSTICE, concur.